## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | | |
|---|---|---|
| **SANDRA SHORT, DAVID SHORT, DONALD SHORT, and SARAH SARBACKER,** | ) ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | **COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY** |
| v. | ) ) ) | **RELIEF** |
| **BILLINGS COUNTY**, a political subdivision of the State of North Dakota, | ) ) ) ) | **Jury Trial Demanded** |
| **Lester Iverson**, Billings County Commissioner, in his official capacity, | ) ) ) | |
| **Steven Klym**, Billings County Commissioner, in his official capacity, and | | |
| **Dean Rodne**, Billings County Commissioner, in his official capacity, | | |
| Defendants. | | |

Plaintiffs Sandra Short, Sarah Sarbacker, David Short, and Donald Short (the "Shorts") complain and allege as follows.

### INTRODUCTION

1.       This lawsuit should not have been necessary. It only arises because the Billings County Board of Commissioners does not keep its word.

2.       The Shorts bring this action because the Board of Commissioners (the "Board") has made clear that it believes it can selectively ignore the contracts that it signs on the dubious ground

that an election had occurred, and thus the Board is effectively a distinct municipal unit that is not bound by the actions of previous boards.

3.      The Shorts have been fighting for more than a decade to keep the Board and Billings County (the "County") from condemning the Shorts' family homestead (the "Short Ranch") in the name of the Little Missouri River Crossing project ("LMRC"). The LMRC—the County's own "bridge to nowhere"—is a monument to public money being deployed for the benefit of private interests. With the LMRC, the County elevates the abusive use of the government's police power to an art form.

4.      The LMRC will connect two sides of the Little Missouri River for the purported benefit of regional oil and transportation interests. The LMRC is projected to cost tens of millions of dollars. Any supposed public benefits are pretextual window dressing intended to hide the LMRC's true purpose. And the costs will be borne by taxpayers and the Shorts.

5.      The costs the LMRC will impose on the Short Ranch—which will be effectively bisected—are immeasurable.

6.      This is not the first time the Shorts have had to litigate to vindicate their rights. The impetus for this action is the Board's breaching of a Settlement Agreement (the "Agreement") that was intended to resolve three separate suits aimed at stopping the LMRC. The Agreement required the Shorts to dismiss their lawsuits in exchange for the County agreeing that it would not use its eminent domain power to condemn the Short Ranch for the LMRC.

7.      But public records show that the Board never intended to honor the Agreement. Apparently under the belief that an election nullifies any existing contract, the Board continued to discuss the LMRC *on the same day it signed the Agreement*. In fact, in publicly available minutes the Board described the Agreement as just a "resolution."

8.     Early this year the Board figuratively shredded the Agreement and formally revived the prospect of condemning the Short Ranch for the LMRC. Knowing full well that the Shorts would never sell the land, the Board decided to make the Shorts an offer that the Board thinks cannot be refused—$20,000 per acre for the land needed for the LMRC. This offer was formally conveyed to the Shorts by a letter dated June 23, 2023.

9.     The Board's offer—which is roughly 800% higher than similar land transactions—was clearly designed to preempt any efforts by the Shorts to contest the "just compensation" of a condemnation. But the Board structured the offer as an option contract containing two poison pills. First, if the Shorts accepted it, they would be deprived of a ripe justiciable controversy and thus be unable to challenge the LMRC in court. Second, if the Shorts reject the option, the County will then be able to initiate "quick take" condemnation procedures provided by North Dakota statute.

10.    The Board's offer is fundamentally incoherent. The proposed option contract is only possible by the Board's breaching of the Agreement, which is itself a contract. Thus, there is no reason for the Shorts to believe that the proposed option contract will not simply be reneged on in the future. If the County's position prevails, any vendor doing business with the County would be on notice that their contracts are terminable at the County's will, with no recourse.

11.    This lawsuit is the Shorts' final line in the sand. The LMRC is proceeding in direct breach of the Agreement. The Board has made clear that it intends to finalize the LMRC before July 2024, when it believes current federal approvals needed to secure federal funding expire.

12.    North Dakota statutes allow the County to condemn the Shorts land and proceed with construction even as the Shorts appeal. Because this dispute is not about the amount of just compensation, but whether the County has any right to condemn at all or is acting in bad faith, this is not a dispute that can be resolved with money. The historic, aesthetic, and unique value of the

Short Ranch will be irreparably damaged if the County is not blocked from moving down its current path.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity between the Shorts, Billings County, and the individual Defendants, and because the amount in controversy exceeds $75,000 as the County has valued the 30 acres that the Shorts seek to protect at $20,000 an acre.

14.     The Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treaties of the United States. The Shorts also assert claims for declaratory relief under 42 U.S.C. § 1983.

15.     Additionally, pursuant to 28 U.S.C. § 1367 the Court has supplemental jurisdiction over the Shorts' North Dakota state law claims because those claims are so related to the Shorts' federal claims that they form part of the same case or controversy.

16.     The Court may assert personal jurisdiction over Billings County and Messrs. Iverson, Klym, and Rodne in their official capacity because Billings County is a political subdivision of North Dakota, and the Defendants' acts at issue occurred within this jurisdiction.

17.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims in this action occurred in this district. Specifically, Messrs. Iverson, Klym, and Rodne are all residents of North Dakota, Billings County is a political subdivision of North Dakota, and the Short Ranch is in North Dakota.

18.     This case is properly filed in Bismarck, North Dakota and is properly before the Western District of this District pursuant to Civil Local Rule 3.1(A) because the acts and omissions from which this action arises took place and continue to take place in Billings County, North

Dakota. Further, the Short Ranch is in the Western Division. The Short Ranch sits within Township 143N, Range 102W, in Billings County alongside the Little Missouri River.

## PARTIES

19.      Plaintiff Sandra Short resides in Marshalltown, Iowa, and owns parcels of the Short Ranch that will be condemned for the LMRC; specifically, Sections 16, 21, 27, and 32 of Township 143 North, Range 102 West. Mrs. Short is the mother to Sarah Sarbacker, David Short, and Donald Short.

20.      Plaintiff Sarah Sarbacker (née Short) is a resident of Sioux Falls, South Dakota, and owns parcels of the Short Ranch that will be condemned for the LMRC; specifically, Sections 22, 26, 33, 34, and 35 of Township 143 North, Range 102 on both sides of the Little Missouri River.

21.      Plaintiff David Short resides in Mesa, Arizona, and owns parcels of the Short Ranch that will be impacted by the LMRC.

22.      Plaintiff Donald Short resides in Des Moines, Iowa, and owns parcels of the Short Ranch that will be impacted by the LMRC.

23.      Defendant Billings County is a political subdivision of the State of North Dakota. As a county under North Dakota law, Billings County "may sue and be sued, contract and be contracted with." N.D.C.C. § 11-10-01.

24.      Defendant Lester Iverson, who is sued in his official capacity, is a commissioner on the Billings County Board of Commissioners.

25.      Defendant Steven Klym, who is sued in his official capacity, is a commissioner on the Billings County Board of Commissioners.

26.      Defendant Dean Rodne, who is sued in his official capacity, is a commissioner on the Billings County Board of Commissioners.

<u>RELEVANT LEGAL FRAMEWORK</u>

**EMINENT DOMAIN IN NORTH DAKOTA**

27.     Article I, § 1 of the Constitution of North Dakota declares: "All individuals are by nature equally free and independent and have certain inalienable rights, among which [is that] of . . .acquiring, possessing *and protecting property*. . . ." (Emphasis added.) The Declaration of Rights in the North Dakota Constitution also protects private property from being taken by government for public use without just compensation being first paid to the landowner or deposited with the Court. N.D. Const. art. 1 § 16. These principles have been further refined and articulated by the North Dakota legislature through North Dakota Century Code § 32-15.

28.     Counties in North Dakota seeking to widen, alter, change, or relocate highways can utilize North Dakota's eminent domain framework to purchase or obtain land within constitutional boundaries. N.D.C.C. § 24-05-09.

29.     Three criteria must, per statute, be satisfied before any property can be taken: (1) the intended use must be authorized by law; (2) the taking must be necessary to that use, and (3) if the property is "already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use." N.D.C.C. § 32-15-05.

30.     Chapter 32-15 sets forth general categories of "public use." *Id.* § 32-15-02 (including as public uses "Wharves, docks, piers, chutes, booms, ferries, bridges, toll roads, byroads, plank and turnpike roads, railroads and street railways, electric light plants and power transmission lines and canals, ditches, flumes, aqueducts, and pipes for public transportation, supplying mines, and irrigating, draining, and reclaiming lands."). Of course, whether any given project actual constitutes one of these uses is a factual question, and not *every* dock, bridge, transmission line, ditch and mine is actually a *public* use. The statute and the Constitution contain

6

other limits on the exercise of eminent domain: "Private property may not be taken for the use of . . . any private individual or entity, unless that property is necessary for conducting a common carrier or utility business." N.D.C.C. § 32-15-01; *see also* N.D. Const. art. 1 § 16.

31.     A condemning government entity must "make every reasonable and diligent effort to acquire property by negotiation," N.D.C.C. § 32-15-06.1(1), and prior to entering negotiations must prepare an offer that the condemnor believes to be "just compensation." N.D.C.C. § 32-15.06.1(2).

32.     If the owner of the to-be-condemned land refuses the offer, the county must convene a special board to declare the necessity for the taking of the land and fix damages (compensation) for said taking. N.D.C.C. §§ 24-05-10, 24-05-11. Within 15 days of formally convening the special board, the special board must schedule a meeting to take place within 30 days of convention. N.D.C.C. § 24-05-11.

33.     After scheduling the special board meeting, by law the special board must follow notice requirements intended to allow interested or aggrieved parties to be heard, including causing notice of the meeting once each week for two successive weeks prior to the meeting. *Id.* In addition, condemnees can require the special board to provide information on the affected property owners and to examine maps of all land affected by the taking. N.D.C.C. § 32-15-06.2.

34.     Once the special board fixes damages, the Board is required to deposit the amount for each affected landowner with the clerk of the local district court. *Id.* § 24-05-12. It is then up to the landowner to retrieve the money or challenge the taking.

35.     Once damages have been deposited, the clock starts to run on the "quick take" procedure in Chapter 24-05. In effect, the deposit gives landowners 30 days to accept the deposit, or the clerk is required to record title in the name of the county. *Id.* § 24-05-13. Landowners are

permitted to appeal the special board's decisions, *id.* § 24-05-14, but appeals do not stay the condemnation process. *Id.* § 24-05-15. After a quick take, affected property owners who successfully challenge the condemnation are only able to recover damages to the property upon reconveyance.

36.     A separate eminent domain statute allows counties to acquire land for rights of way in a manner that circumvents the special board process described above. N.D.C.C. § 11-10-26. Under that provision, the only actions required of counties is an offer of purchase and the subsequent deposit of that amount with the clerk of the district court, after which the county can take "immediate possession of the right of way." *Id.*

37.     Regardless of the statute through which eminent domain is exercised, Chapter 32-15 provides for judicial review of the condemnation.

## THE ROLE OF THE FEDERAL GOVERNMENT

38.     Because federal funds were considered at one point, and because the project was expected to cross federal land, the federal government acting through the Federal Highway Administration ("FHWA") was required by law to perform an environmental impact analysis under the National Environmental Policy Act ("NEPA").

39.     Under NEPA, an Environmental Impact Statement (EIS) must be prepared for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires that the decision-maker, as well as the public, be fully informed so that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

40.     One of NEPA's fundamental goals is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."

42 U.S.C. § 4321. The scope of NEPA review is quite broad, including the consideration of all reasonable alternatives, 40 C.F.R. § 1502.14(a), and direct, indirect, and cumulative effects on "ecological . . . aesthetic, historic, cultural, economic, social, or health" interests. 40 C.F.R. § 1508.8. NEPA requires adequate disclosure of all such impacts. The NEPA documentation must provide the decision-maker and the public with adequate information, evidence, and analyses to fully assess the potential impacts of the proposed actions. *Id*. § 1502.1.

41.     The requirement to evaluate all reasonable alternatives is not simply procedural; the Council on Environmental Quality—an executive body created by NEPA—has stated that the alternatives analysis is "the heart" of the NEPA analysis. 40 C.F.R. § 1502.14; *see also* 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1507.2(d). The federal agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"; "[d]evote substantial treatment to each alternative considered in detail including the proposed action"; and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a)–(c).

42.     Decisions based on EIS must be published as a matter of public record. 40 C.F.R. § 1505.2. These are informally known as "Records of Decision," or "ROD."

## FACTS COMMON TO ALL CLAIMS

43.     The Short Ranch consists of approximately 3,000 acres along the Little Missouri River in Billings County. The Shorts return to the Short Ranch regularly—typically every year— and intend to continue doing so. The Shorts will be imminently and irreparably harmed if the LMRC is built in accordance with Billings County's plans. The Shorts are further being subjected to ongoing and irreparable harm due to deprivation of constitutional rights and imminent unconstitutional taking of their land.

44.     The Shorts' roots at the Ranch run deep. Hugh Connorran and Ann Otley Short first purchased the land in 1904. Their son Don, who served three terms as North Dakota's representative to the United States House of Representatives, lived on the Short Ranch his whole life. The Shorts have worked with historians to nominate the Ranch to the National Register of Historic Places. This process is ongoing and, if successful, will require the existing environmental impact statement to be reassessed.

45.     Don's son, Con, married Plaintiff Sandy Short. Con and Sandy Short raised Plaintiffs Dave Short, Don Short, and Sarah Sarbacker on the Short Ranch. When Con Short passed, his ashes were spread on the banks of the Little Missouri River within the bounds of the Short Ranch near where Billings County wants to force its bridge across the Short land.

46.     Mrs. Sarbacker and her family regularly return to the Short Ranch and intend to continue doing so.

47.     David Short's retirement plans are to return to the Short Ranch and develop a cow-calf operation. David Short left the Ranch to attend college and find a job, but he has always planned to again make the Short Ranch his home. He and his family return to the Short Ranch every summer and intend to continue doing so.

48.     Donald Short and his family regularly return to the Short Ranch and intend to continue doing so.

49.     The Shorts pride themselves on being good stewards of their land and sharing it with the public by, for example, welcoming hunters onto the property.

50.     Apart from the Shorts' ties to the Short Ranch, the Shorts have tenants living on the property full time.

## BACKGROUND ON THE LITTLE MISSOURI RIVER CROSSING

51.     The LMRC is a project long championed by former Billings County Commissioner James Arthaud that will have no realistic benefit or utility for the public. If completed, it will be a monument to wasteful spending and the triumph of narrow commercial interests over those of the people.

52.     Efforts to implement the LMRC are almost two decades old. The current project was first contemplated in 2006 with a proposed route near the Elkhorn Ranch, the historical homestead of former president Teddy Roosevelt. Billings County initiated an EIS but backed off after widespread public opposition to the fears of negatively affecting the Elkhorn Ranch.

53.     The Board's interest in the LMRC was revived by the shale oil boom. As the previous EIS had never been finalized, in the summer of 2012 work began again. At that time, Mr. Arthaud told a room of people—including some of the Shorts— that "1,000 oil trucks a day" would use the LMRC bridge.

54.     In July 2018, almost twelve years after it began, the draft EIS was made public. It was at this time that the Shorts first learned that their property had been targeted for condemnation.

55.     In the EIS, a contractor (KLJ) hired by Billings County and the FHWA analyzed alternatives suitable to meet the purpose of the LMRC. In total, the LMRC EIS purported to consider ten different routes, known as Alternatives A, B, C, D, E, F, G, H, I, and K. Fed. Highway Admin., FHWA-ND-EIS-19-01-F, pp. 23-31 (June 2019). Alternative K itself had three different variations, all three of which went through the Short Ranch. *Id.* at 29.

56.     Among the untenable assumptions included in the EIS, the FHWA claimed the data only supported an assumed 200 vehicles would use the LMRC daily; this directly contradicted Mr. Arthaud's statement. *Id.* at 13.

11

57.     KLJ ultimately designated Alternative K—a highly circuitous and inefficient project path—as its preferred alternative. Alternative K traverses the Short Ranch. *Id.* at 31. KLJ chose Alternative K after rejecting all the other alternatives. Alternatives B, C, D, and E were rejected due to their proximity to the Teddy Roosevelt Elkhorn Ranch, a federally protected heritage site. *Id.* at 23-24. Alternatives F, G, H, and I were not fully analyzed because it was determined they did not meet certain technical requirements. *Id.* at 24. Alternatives A and J were rejected because they were outside of Billings County, and thus the County was unable to fund them.[1] *Id.*

58.     That left the three variations of Alternative K, which were chosen specifically because it would traverse private property (the Short Ranch) as opposed to public property, and despite the fact it is not the most efficient for vehicles and poorly utilizes the existing transportation network. *Id.* at 28. In other words, Billings County specifically targeted the Shorts' land for the LMRC because it wanted to avoid pushback from the federal or state government to putting the project on the *ample* public lands in this area of the County, despite the claim by the County that this is for a "public benefit."

59.     If the Board's statements about the LMRC's purpose are true, (*infra,* ¶ 77), the most efficient location for the LMRC is near the Elkhorn Unit of Theodore Roosevelt National Park, approximately four miles north of the Short Ranch. There, the LMRC could leverage existing road infrastructure built specifically for the purpose of connecting the two sides of the Little Missouri River. Billings County and the FHWA initially identified three Alternatives that would be built adjacent to the Elkhorn Unit—Alternatives C, D, and E. These three Alternatives would not require the condemnation and taking of private property.

---

[1] This last example demonstrates how implausible the other "options" were to begin with.

60.     The FHWA describes the LMRC's alleged purpose as follows:

Improve the transport of goods and services within the study area.

Provide the public with a safe, efficient, and reliable connection:

   a. Between the roadways on the east and west sides of the Little Missouri River within Billings County (internal linkage)

   b. That also improves the connectivity and system linkage between the Billings County and Golden Valley County roadway networks

   c. With the added benefit of providing an additional connection between ND-16 and US Highway 85 within the study area.

Construct a new river crossing over the Little Missouri River in a location that utilizes the existing transportation network, upgrading existing roadways, and/or creating new roadways to best meet roadway and structure design standards.

Accommodate a variety of vehicles, ranging from a two-wheel-drive passenger vehicle to agricultural, commercial, and industrial vehicles and equipment.

*Id.* at 12.

61.     Under Alternative K, the LMRC would be approximately 8.3 miles long, of which 6.2 miles would closely follow the existing roadway alignment and 2.1 miles would be new roadway construction. The project alignment would run from Belle Lake Road to Short Road in Billings County, on both sides of the Little Missouri River. The LMRC would cut through the heart of the Short Ranch in one of the most rugged and fragile landscapes of North Dakota.

62.     The LMRC is projected to cost at least $15 million of Billings County taxpayer money to build.

13

**THE COUNTY MOVES TO CONDEMN THE SHORTS' PROPERTY**

63.     On March 27, 2020, the Shorts, by and through their counsel, sent an open records request to Billings County (the "Request"). The Shorts sent the Request because Billings County's contractor, KLJ, was seeking access to the Short Ranch to survey the property for the LMRC. With the Request, the Shorts sought to learn more about the construction timeline and the reason for the survey request.

64.     On or about March 29, 2020, KLJ began its survey without the Shorts' permission. It was conducted despite resistance from the Shorts' tenant and an assertion from the Shorts' legal counsel that the Shorts did not agree that Billings County had any legal right to access their property.

65.     On April 2, 2020, the County's counsel acknowledged the Request and took steps to respond. Upon information and belief, the County did not begin searching for records prior to April 2, 2020. The County's counsel stated in an email to the Shorts' counsel that she was "sensitive to the urgency with which you make your request."

66.     On April 9, 2020, the County mailed a partial response to the Request. These records did not arrive until April 17, 2020.The County ostensibly mailed the remainder of its response on April 29, 2020. These records arrived in the mail on May 4, 2020. The records received on May 4, 2020, consisted of documents collected by KLJ.

67.     On April 14, 2020, Billings County held a County Commission meeting. A true and correct copy of the agenda from that meeting as it is currently posted on the County's website is attached to this Complaint as Exhibit 1. The agenda for the April 14, 2020, Board meeting—posted ahead of the meeting—made no mention of the LMRC; it instead cryptically listed "eminent

14

domain" with no other information. But at this meeting, and without notice, the Board approved a resolution authorizing the use of eminent domain for the LMRC (the "Resolution").

68.     The Shorts were not present for the Resolution vote, and the County did not make them aware of it. It was only in May 2020 that the Shorts learned of the Resolution—after the County had approved the April meeting's minutes and made them public. The text of the resolution was ambiguous as to whether the County was acting under Chapter 24-05 or the right-of-way authority in Chapter 11-10. Ex. 2.

69.     As described below, this inexplicable lack of notice happened even though (1) the Shorts' records request was still outstanding and (2) the Shorts and the County were still litigating the EIS. (*Infra,* ¶¶ 79-102.)

70.     The County gave no actual notice to the Shorts that it would consider the Resolution. Nor did it publish one for the public. Even after passing the Resolution, the County gave no notice to the Shorts.

71.     If the Shorts had known that the Resolution would be considered at the April 14, 2020, meeting, they would have participated.

72.     On information and belief, the Resolution considered at the April 14, 2020, meeting was drafted prior to the meeting.

73.     On May 13, 2020, the Shorts invoked their rights under North Dakota Century Code § 32-15-06.2 and requested the County provide information about the landowners affected by the Resolution and a map of all affected land. Though this information was included in an exhibit explicitly referenced in the Resolution, it was not made publicly available at the meeting by the County.

74.     The Shorts received in response a detailed map showing that the condemnation resolution primarily affected the land then owned by Plaintiffs Sandra Short and Sarah Sarbacker. It was dated on the bottom left of the page "4/2/2020."

75.     Billings County was required under North Dakota law to provide a copy of this map in response to the Shorts' open records request but failed to do so, despite the fact it is dated "4/2/2020" and thus existed before the County sent its first response to the Shorts' open records request. Billings County did not provide all records in response to this records request until April 29, 2020. Further, on information and belief, Billings County did not begin searching for records until after April 2, 2020, and KLJ did not complete its search for records until April 18, 2020.

76.     In summary, the Board considered and passed the Resolution to condemn part of the Short Ranch, intentionally without any notice to the Shorts or the public. Further, both the Resolution and its exhibit were drafted prior to the Board meeting on April 14, 2020, *while a records request for exactly this type of record was pending*. The County then illegally withheld this record to keep the Shorts in the dark as to its plans. Further, the County's counsel, to whom the records request was originally sent, was part of the meeting on April 14, 2020, and thus was aware of the Shorts' request. The only logical explanation for the County's failure to provide even perfunctory notice to the Shorts is that these records were intentionally withheld as part of the County's plan to sandbag the Shorts and condemn their property via quick take with as little notice as possible.

77.     The relevant portion of the Resolution, as found in Exhibit 2, provides as follows:

> WHEREAS, Billings County has determined that an additional highway and crossing over the Little Missouri River, located between the Long X Bridge and I-94 bridges, is necessary to provide users with a safe, efficient, and reliable local connection between roadways on the east and west sides of the Little Missouri River; and

16

>WHEREAS, Billings County has determined a connection between Belle Lake Road and Short Road to East River Road is the preferred route of the new highway and crossing and that additional land is needed for construction, reconstruction, widening, altering, changing, locating, relocating, aligning, realigning, repairing, and maintaining the road, and for other right-of-way purposes.

78.    Nowhere in the Resolution, or in the minutes, does there exist any indication that the County engaged in any kind of analysis or deliberative process to determine whether the condemnation of the Short Ranch was necessary for its project, or whether the project is for a public use or benefit.

79.    The Shorts continue to believe that the Resolution's references to "users" were to the oil interests who would benefit most from the LMRC.

**HISTORY OF LITIGATION BETWEEN PLAINTIFFS AND BILLINGS COUNTY**

80.    The Shorts challenged the EIS on December 27, 2019, by filing suit against the FHWA, and other individuals in their capacities at various government agencies, alleging violations of NEPA, the NHPA, the Administrative Procedure Act, and other statutes (the "FHWA Action"). *Sandra Short et al. v. Fed. Highway Admin. et al.*, No. 1:19-CV-285-DLH-CRH (D.N.D.).

81.    The FHWA Action alleged that FHWA: (1) violated NEPA by failing to analyze all potential impacts the LMRC would have on the surrounding human environment; (2) acted in a way that hindered the notice and comment process; (3) violated the NHPA by failing to determine whether the Short Ranch was eligible for inclusion in the National Register of Historic Places; (4) violated the NHPA by preventing the Shorts' from commenting on the process as consulting parties; and (5) along with the United States Forest Service, violated the Department of Transportation Act of 1966, 49 U.S.C. § 303, by failing to designate the public land implicated by

the LMRC as protected land entitled to greater procedural protections before a highway can be built. *See id.* (No. 1).

82.     Billings County moved to intervene in the FHWA Action on February 5, 2020, *id.* (No. 5), and its motion was granted on April 21, 2020. *Id.* (No. 20).

83.     The County's move to intervene occurred contemporaneous with its efforts to move forward with the LMRC illegal condemnation, up to and including the Resolution. (*Supra*, ¶ 77.)

84.     Given the County's conduct and its refusal to keep the Shorts informed about its intentions, the Shorts had no choice but to hold the County accountable directly. They did so on May 14, 2020, by filing suit in the District of North Dakota against the County and its then commissioners (the "Billings County Action"). *Sandra Short et al. v. Billings County et al.*, No. 1:20-CV-79-DMT-CRH (D.N.D.). With this suit, the Shorts sought to vindicate their constitutional rights, and further sought declaratory relief declaring that the taking of the Shorts' property was neither necessary nor for a public purpose under either federal or North Dakota law.

85.     The Shorts, along with another family whose land was threatened by the LMRC, also challenged the County in state court by appealing the Board's approval of the 2021 Billings County Road and Bridge Budget—which appropriated significant funds for the LMRC—on October 6, 2020. *Short et al. v. Billings County Board of Commissioners*, No. 04-2020-CV-00015.

86.     While these lawsuits were pending, the Board on April 6, 2021, approved a motion to offer the Shorts $2,500 per acre condemned for the LMRC, along with $500 per acre per year for that same land during construction. Ex. 3 at 2. This decision followed a lengthy and contentious public meeting—held at the Medora Community Center to accommodate the crowd of interested citizens—where numerous members of the public spoke out against the use of eminent domain as

an abusive way to accomplish the LMRC project and disrespectful to Billings County landowners. At least two commissioners, Dean Rodne and Mike Kasian, seemed to agree with these sentiments.

87.     Leading up to the Board's meeting on April 6, 2021, Commissioner Dean Rodne communicated frequently with Plaintiff Dave Short. Commissioner Rodne had run for County Commission based in part on his desire to represent those in Billings County who are opposed to the LMRC project and do not want to pay for it and has always maintained a working professional relationship with the Short family. The Shorts understood that Commissioner Rodne shared their view regarding the use of eminent domain for the LMRC project.

88.     Later, Dave Short also began communicating directly with Commissioner Mike Kasian. Prior to this, Chairman Kasian had heard from others, both at the meeting as well as, for example, through a letter from a landowner association urging Billings County to "reach out to other landowners who might be willing hosts and find a way to move forward with the project without using the extraordinary power of eminent domain to take private property from American citizens." Dave Short and others convinced Chairman Kasian that it was morally wrong to use the power of eminent domain for the LMRC project, and in so doing, two out of three of the Billings County Commission agreed that the use of eminent domain for the Project was wrong and they decided the County should never take the Short Ranch by force.

89.     Commissioner Rodne indicated to Dave Short that he agreed it was not fair that the Shorts had to defend their property from the County's attempts to take their property.

90.     Chairman Kasian also indicated to Dave Short that he agreed the the Short Ranch was being unfairly targeted.

91.     Commissioner Rodne and Chairman Kasian separately agreed with Dave Short that if the County ceased all efforts to take the Shorts' land and promised never to attempt to do so

again, that the Shorts would dismiss their legal actions and forgo all claims against the County for having to defend their land against the actions of Billings County.

92.     Dave Short discussed this agreement with Commissioner Rodne and Chairman Kasian prior to July 6, 2021.

93.     The Board memorialized this agreement on July 6, 2021.

## The Settlement Agreement

94.     At the Board's regular meeting on July 6, 2021, Chairman Kasian and Commissioner Rodne went on the record to let the public know that they agreed with the Short family that using eminent domain for the LMRC was inappropriate. Commissioner Rodne further stated that both a majority of the public and the affected landowners (such as the Shorts) should agree with whatever route the LMRC used. Ex. 4 at 2-3.

95.     Chairman Kasian "stated his opinion that eminent domain was not an appropriate method for the [County] to use," and that "there existed a conflict of interest concerning the authorizations by previous commissioners." *Id.* at 2. Chairman Kasian also "wanted the commission to go on record as being against eminent domain." *Id.* at 3. The Board—including Commissioner Iverson—then voted unanimously[2] to "rescind all previous authorizations for a bridge over the Little Missouri River located at the Short Ranch." *Id.* The Board then unanimously approved a motion recognizing the "need for a cross on the Little Missouri River north of Medora and that the county negotiate with the US Forest Service or private property owners to accomplish this." *Id.*

---

[2] Commissioner Iverson purportedly came to regret his vote and asked that the minutes be amended to reflect a "no" vote. While this change was made it had no effect on the outcome of the motion.

96.   The very same day, Billings County's counsel reached out to the Shorts' counsel asking the Shorts about stipulating to the dismissal of the pending lawsuits against the County given the Board's rescission. Ex. 5.

97.   The Shorts' counsel sent a letter and a draft settlement agreement to the County on July 29, 2021. Ex. 6. The letter indicated that "in exchange" for the Commission voting to rescind prior approvals for the LMRC, "they are willing to end the ongoing litigation against Billings County." Ex. 7. The letter further noted that the Shorts were willing to forfeit any chance to recover the significant expenses arising from the defense of the Short Ranch. *Id.*

98.   The County executed the Agreement on August 3, 2021.

99.   Under the Agreement, the County "agreed it will not pursue eminent domain to condemn any of the Short property for a Little Missouri River Crossing or pursue any legal action against the Shorts to condemn their property." Ex. 8. Further, the Agreement incorporated the July 6, 2021, vote to rescind LMRC authorization as further consideration from the County. *Id.*

100.   In exchange for the above, the Shorts made the following promises:

a.   They would not pursue any of the three lawsuits that were still pending, whether in the original forum or through any appeals; and

b.   They would dismiss with prejudice any three of their lawsuits that remained pending within fourteen days of execution of the Agreement.

*Id.*

101.   Relying on the Agreement, the Board's statements at its July meeting, and its rescission of LMRC authorizations, the Shorts kept their end of the bargain. They let their right to object to Magistrate Judge Miller's Report and Recommendation expire and did not appeal when said Report was adopted, thereby dismissing the Billings County Action. And the Shorts—along

with Billings County and the FHWA—stipulated to dismissal of the FHWA Action. *Fed. Highway Admin.*, No 1:19-cv-00285 (D.N.D.) (No. 49).

102.   And with that, the Shorts thought that the matter was settled and that the Short Ranch was safe from further assault from the County.[3]

## Billings County Breaches the Settlement Agreement

103.   The County's disregard for the Agreement was apparent almost immediately. Chairman Kasian and County Auditor Marcia Lamb signed the Agreement on August 3, 2021. That same day, the Board held a regular meeting and the LMRC was again on the agenda. Commissioner Iverson then stated it was his intention to move to rescind the July 6, 2021, motion revoking authorization for the LMRC. Ex. 10.

104.   Commissioner Iverson put his plans on hold to explore other options with the state. Ex. 11. Yet it soon became clear that those other options still implicated the Short Ranch. Ex. 12.

105.   At the Board meeting on November 9, 2021, a resident asked "if the board [*sic*] signed anything with the Shorts stating that they wouldn't move forward with eminent domain on that property." Ex. 13 at 2. While the Board minutes on this exchange are not clear as to speakers, the Agreement—a binding contract—was described as a "resolution . . . stating that [the County] wouldn't move forward with involuntary eminent domain in order to have the lawsuits dropped." *Id.*

---

[3] The merits of the Shorts' federal cases were never decided. The Billings County Action went through briefing on the defendants' motions to dismiss the Shorts' amended complaint and was disposed of by Judge Traynor's adoption of Magistrate Miller's Report and Recommendation of dismissal made on the basis that the Shorts' federal claims were not yet ripe. *Billings County*, No 1:20-CV-79-DMT-CRH (Nos. 29, 30). The Shorts chose not to appeal the Magistrate's Recommendation based on settlement discussions with Billings County, thereby allowing the adoption by Judge Traynor without challenge. In the FHWA Action, the FHWA had answered, and the parties were nearing summary judgment when settlement was reached.

106.    But on November 8, 2022, Chairman Kasian lost the race for County Commissioner to Steve Klym.

107.    Soon after Commissioner Klym assumed his position, on February 7, 2023, the Board voted to "proceed with the Little Missouri River crossing bridge project in the selected location within the EIS." Ex. 14 at 2.

108.    On February 10, 2023, the Dickinson Press reported:

> Billings County may revive a controversial bridge project, after a recent commission election tilted the balance in its favor. The project was originally abandoned in July 2021, but Billings County State's Attorney Pat Weir said the county spent approximately $4.5 million on the environmental impact study and now the bridge and potential use of eminent domain to force its construction is back on the table.

109.    Even though the Board had publicly stated its opposition to using eminent domain against the Short Ranch—by the resolutions it had passed and by the comments of the individual commissioners at public meetings—it has inexplicably acted to do so anyway.

110.    Whether there is a new commissioner on the County Commission or not, the County Commission entered into a contractual agreement and induced reliance by the Shorts on its promise not to condemn their property.

111.    Rather than abiding by the Agreement and its own public commitments, on April 4, 2023, Commissioners Iverson and Klym voted in a closed session to steer the County down a new path and decided to offer the Shorts $20,000 an acre for a permanent easement across the Short Ranch, and $500 per acre per year for a temporary easement on land adjacent to the LMRC construction. Ex. 15 at 1. Commissioner Rodne disagreed. *Id*.

112.    The Board's regular meetings in May and June 2023 came and went with no discussion of the LMRC. More than two months passed before the County gave the Shorts any formal notice of the offer.

113.    On June 23, 2023, Billings County's counsel sent a letter to the Shorts purporting to open "easement negotiations" connected to the LMRC (the "Letter"). Ex. 16. The Letter, however, did not convey the offer that the Board had publicly approved on April 4, 2023. Instead, the Letter offered an option contract that would provide the Shorts $20,000 per acre for 29.86 acres of the Short Ranch, and $500 per acre per year for 12.10 acres as a temporary easement for construction. *Id.* at 1. Under the proposed option contract (the "Option"), in exchange for $1,000 earnest money the County would have five years to finalize the conditions precedent to starting construction on the LMRC. *Id.* at 2. Those final conditions include the FHWA's final approval of a previously unknown supplemental environmental impact statement,[4] and "final acquisition of all options or property rights needed for the project." *Id.*

114.    Notably, these preconditions are only described in the Letter. They are not mentioned in the Option.

115.    Buried in the text of the Option is the discretionary power for the County to take title to ten acres of the Short Ranch, instead of a permanent easement, at the same $20,000 per acre price. Ex. 17 at 1. The County also has the power to extend the option by another five years upon thirty-days' notice prior to the expiration of the current term and deposit of another $1,000 earnest money. *Id.* There is no provision for the Shorts to object to an extension.

116.    The Letter explained that "[a] prior County Commission made the determination in 2021 not to proceed with the location across Short's property in hopes of finding another suitable location with a landowner willing to sell right-of-way to the County for a bridge," but that "[u]nfortunately, no such location has been identified to date." Ex. 16 at 1.

---

[4] The Letter did not explain who sought the supplemental EIS or the basis for the requested review.

117.    The Letter indicates that the Board does not believe that its actions in 2021 bind the Board today, presumably because intervening elections mean a different Board is now in place.

118.    The County's conduct leading up to its breach of the Agreement is an indication to all that the County views its contractual obligations as dispensable at its whim. The formal opening of negotiations with the Shorts is yet another action in "pursuit" of condemning the Short Ranch in bad faith and for no reason but to target a private landowner and avoid public lands—precisely what that the County had agreed not to do. The facts and circumstances surrounding the LMRC have not changed. The County has simply *gone back on its word*. The Shorts have no reason to believe that the County will not simply renege on the Option it now seeks, as it continues to act in bad faith toward the Shorts.

## Condemnation of the Short Ranch is Inevitable

119.    Billings County has reached the point "where it appears condemnation is inevitable," as Judge Miller described. (*Supra,* ¶ 102, n. 7.)

120.    The County knows full well that the Shorts will not accept *any* offer for their property—the family has made that clear for almost a decade. There is no logical reason for the County to make such an offer unless it intends to follow through with eminent domain.

121.    By structuring its offer as an option, the County simultaneously seeks to fulfill its duty to negotiate under § 32-15.06.1, to meet the conditions precedent to implementing the "quick take" procedure in Chapter 24-05, and to lock the Shorts into an option contract seemingly designed to avoid Judge Miller's ripeness trigger while also avoiding any real financial obligation until the County can determine if the federal government will fund it.

122.    To reiterate, Judge Miller had found the Short's previous challenge to the LMRC to be not ripe because "public policy favors not burdening governmental entities with costly

litigation until at least the determination to proceed forward with condemnation is final." *Sandra Short et al. v. Billings County et al.*, No. 1:20-cv-00079, 2021 WL 11644426, at *12 (D.N.D. July 6, 2021). Judge Miller elaborated on what would constitute finality in this context; "the point where the condemning authority makes a decision to proceed forward that is final in the sense *it appears condemnation is inevitable* and not to the last act that actually results in the taking." *Id.* at *12, n. 8 (emphasis added).

123.     By all appearances, condemnation is inevitable. The County has gone back on its word, torn up a contract it had agreed to, and taken concrete steps toward condemning the Short Ranch. All that is left for the County to be able to condemn the Short Ranch is for the Board to decide that it has fulfilled its duty to negotiate with the Shorts and proceed with condemnation.

124.     The County is trying to thread a fine needle. With the Option, the County is giving itself the ability to claim that it followed its statutory duty to negotiate in good faith while setting itself up for a quick take. At the same time, the Letter which accompanied the Option is written to give the impression that the LMRC is not "shovel ready" and that the County needs to satisfy two conditions before construction on the LMRC could even begin.

125.     Indeed, the two conditions precedent the County has described are, at best, incidental to the County's ability to begin construction of the LMRC. *First*, any supplemental EIS would matter only insofar it secured federal funding for the LMRC—something the County has already indicated it was ready to proceed without. *Second*, the County possesses the power it needs to acquire all other property necessary for the LMRC, thus making condition two a question not of *if*, but *when*.

126.     From the Shorts' perspective, these conditions were invented to give the County the ability to argue that any legal challenge to the LMRC is still not ripe. That they were not included in the text of the Option only reinforces that belief.

127.     The pace at which the Board is marching towards condemnation is increasing. On July 26, 2023, the Board held a special meeting at which it set a deadline for the Shorts to respond to the Option—Wednesday, August 2, 2023—after which the Board will assume its offer is rejected. A subsequent email from the County's counsel put the Board's position starkly: "In the case of the Short family, we will either negotiate an easement or we will be in litigation." Ex. 18.

128.     The Board has also announced that it will discuss the LMRC at the Board's regular meeting on August 3, 2023. Ex. 19. Given the comments of the County's counsel, *see* Ex. 18, the Board is ready to declare negotiations with the Shorts closed, at which point it can proceed with its eminent domain tools.

129.     The County cannot be allowed to do this. A governmental entity cannot repeatedly announce its intention to condemn property, take affirmative steps toward doing so right up to the point of no return, and then hide behind procedural formalities to pretend that a taking is not inevitable.

130.     By the Board's declared intent and its subsequent actions to wield it statutory tools, the County has made clear it will condemn the Short Ranch.

131.     The Shorts have, contemporaneous with the filing of this action, notified the County that the Shorts reject the Option.

## CAUSES OF ACTION

### COUNT I

### (BREACH OF CONTRACT)

132.     Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein, and further allege as follows.

133.     The parties negotiated and entered into the Agreement whereby the County agreed not to condemn any part of the Short Ranch for the LMRC, and in exchange the Shorts dismissed their lawsuits against the County and did not pursue any further legal action, and the Shorts also agreed to forgo their claims for reimbursement of their legal fees and expenses in exchange for the County's agreement not to condemn the Short Ranch.

134.     The County "agreed it will not pursue eminent domain to condemn any of the Short Property for a Little Missouri River Crossing or pursue any legal action against the Shorts to condemn their property."

135.     The County breached the Agreement when it again pursued the LMRC when the Board voted at its meeting on February 7, 2023, to "proceed with the Little Missouri River crossing bridge project in the selection location within the EIS."

136.     The County's breach was compounded by the affirmative steps the County has taken to value the Short Ranch and put into place the conditions precedent to taking the Shorts' property.

137.     The County has initiated the conditions precedent to implementing a quick take condemnation of the Short Ranch. Even if the County does not pursue a quick take condemnation, the County's pursuit of condemnation is nevertheless transparent.

## COUNT II

## (PROMISSORY ESTOPPEL)

138.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein, and further allege as follows.

139.    The County made a written promise to the Shorts that it would not pursue eminent domain to condemn any of the Short Property for a Little Missouri River Crossing or pursue any legal action against the Shorts to condemn their property. The County specifically promised the Shorts verbally and in writing that it would never use eminent domain on their property and the Shorts relied on that promise to dismiss and forgo their claims in the pending lawsuits and their claims for reimbursement of their attorneys' fees and expenses. The County understood and expected that the Shorts would rely on its promise in this way.

140.    The Shorts did rely on the County's promise by dismissing their lawsuits and abstaining from any further legal action and any attempts to obtain reimbursement of their attorneys' fees and expenses.

141.    The Shorts reliance was justifiable because the County had rescinded its authorization for the LMRC and because the Chair of the Board had signed the Agreement. The Shorts had no reason to suspect that the County would simply ignore its legal and moral obligations.

142.    It would be unjust if a government entity were allowed to simply disregard a contractual obligation. This attempted condemnation is the *sine qua non* of bad faith. Further injustice would result if the Shorts lost their property after giving up their legal rights to contest the validity of the LMRC. The only way to avoid injustice is to enforce the County's promise.

## COUNT III

## (DECLARATORY JUDGMENT—NO PUBLIC USE UNDER THE FIFTH

## AMENDMENT OF THE UNITED STATES CONSTITUTION)

143.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein, and further allege as follows.

144.    Billings County has, by its public actions and by issuing the Shorts an offer for their land, made the condemnation of the Short Ranch all but inevitable. The County now only needs to decide that it has fulfilled its duty to negotiate with the Shorts to be able to initiate quick take condemnation procedures.

145.    Billings County's taking of the Shorts' property would violate the Fifth Amendment's Takings Clause, which only allows for condemnation of private property for "public use." The Shorts contest that the taking is for a public use.

146.    The County has stated that the LMRC "is necessary to provide users with a safe, efficient, and reliable local connection between roadways on the east and west sides of the Little Missouri River." These nondescript "users" are in fact intended to be the transient truck traffic from regional oil interests.

147.    The County has not articulated how the LMRC will benefit the public that actually lives in Billings County. The LMRC's stated purpose is full of abstractions that obscure the fact that the LMRC's primary purpose is to benefit private interests.

148.    Only two families could conceivably benefit from the LMRC through quicker access to Medora, North Dakota, but they have not asked for the LMRC. Local emergency services oppose using eminent domain to implement the LMRC.

149.    The Final EIS and ROD implied that, at most, 200 cars a day would use the LMRC. That is contradicted by statements from former Billings County Commissioner Jim Arthaud—the LMRC's champion—that 1,000 trucks a day would use the bridge once completed. Former Board Chairman Kasian is on public record saying that members of the Board who passed the Resolution had improper conflicts of interest. These facts only highlight that the EIS and other public statements by the County obscure the LMRC's true purpose.

150.    Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201, Plaintiffs request declaratory relief finding that Billings County's and the Billings County Commissioners' imminent condemnation of the Short's land is in bad faith and violates the public use requirements of the Fifth Amendment's Takings Clause (as incorporated through the Fourteenth Amendment).

### COUNT IV

### (DECLARATORY JUDGMENT—NO PUBLIC USE UNDER ARTICLE 1, SECTION 16 OF NORTH DAKOTA CONSITUTION AND N.D.C.C. § 32-15-05(1))

151.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein, and further allege as follows.

152.    Billings County has, by its public actions and by issuing the Shorts an offer for their land, made the condemnation of the Short Ranch all but inevitable. The County now only needs to decide that it has fulfilled its duty to negotiate with the Shorts to be able to initiate quick take condemnation procedures.

153.    The County has stated that the LMRC "is necessary to provide users with a safe, efficient, and reliable local connection between roadways on the east and west sides of the Little Missouri River." These nondescript "users" are in fact intended to be the transient truck traffic from regional oil interests.

154.    The County has not articulated how the LMRC will benefit the public that actually lives in Billings County. The LMRC's stated purpose is full of abstractions that obscure the fact that the LMRC's primary purpose is to benefit private interests. This is not a proper or legally authorized use pursuant to N.D.C.C. § 32-15-05(1)).

155.    The County has stated that the LMRC "is necessary to provide users with a safe, efficient, and reliable local connection between roadways on the east and west sides of the Little Missouri River." These nondescript "users" are in fact intended to be the transient truck traffic from regional oil interests.

156.    The County has not articulated how the LMRC will benefit the public that actually lives in Billings County. The LMRC's stated purpose is full of abstractions that obscure the fact that the LMRC's primary purpose is to benefit private interests. This is not a proper or legally authorized use pursuant to N.D.C.C. § 32-15-05(1)).

157.    Only two families could conceivably benefit from the LMRC through quicker access to Medora, North Dakota, but they have not asked for the LMRC. Local emergency services oppose using eminent domain to implement the LMRC.

158.    The Final EIS and ROD implied that, at most, 200 cars a day would use the LMRC. That is contradicted by statements from former Billings County Commissioner Jim Arthaud—the LMRC's champion—that 1,000 trucks a day would use the bridge once completed. These only highlights that the EIS and other public statements by the County obscure the LMRC's true purpose. Former Board Chairman Kasian is on public record saying that members of the Board who passed the Resolution had improper conflicts of interest. These facts only highlight that the EIS and other public statements by the County obscure the LMRC's true purpose.

159.    Pursuant to 28 U.S.C. § 2201, Plaintiffs request declaratory relief finding that Billings County's and the Billings County Commissioners' imminent condemnation of the Shorts' land is in bad faith and violates the public use requirements of article 1, §16 of the North Dakota Constitution and North Dakota Century Code § 32-15-05.

**COUNT V**

**(DECLARATORY JUDGMENT—LACK OF NECESSITY UNDER N.D.C.C. § 32-15-05)**

160.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein, and further allege as follows.

161.    North Dakota Century Code § 32-15-05 states that before a public entity, such as Billings County, may condemn property, "it must appear [t]hat the taking is necessary to such use."

162.    The LMRC route, Alternative K, was chosen by a contractor for the Federal Highway Administration based on considerations under NEPA, not eminent domain or takings law.

163.    Billings County has not demonstrated that there is not a more suitable location for a bridge across the Little Missouri River Crossing as it never undertook any analysis after the County entered into the Agreement and committed on the record that it would find a location other than through the Short Ranch.

164.    Billings County's lack of diligence in this regard precludes any finding that the LMRC as currently designed is located out of necessity. Billings County has not attempted to identify an alternate route.

165.    Pursuant to North Dakota Century Code § 32-23-01 and § 32-15-05, Plaintiffs request declaratory relief that Billings County's and the Billings County Commissioners'

imminent condemnation of the Shorts' land is not necessary to the County's declared public use and is proceeding in bad faith.

## PRAYER FOR RELIEF

The Plaintiffs respectfully request relief from the Court in the following forms:

I.   Order Billings County to specifically perform as it had promised in its Settlement Agreement with the Shorts;

II.   Adjudge and declare that Billings County and the Billings County Commissioners' imminent plans to condemn the Shorts' land violates the Takings Clause of the Fifth Amendment of the United States Constitution, as applied to Billings County through the Fourteenth Amendment;

III.   Adjudge and declare that Billings County and the Billings County Commissioners' imminent plans to condemn the Shorts' land violates article 1, §16 of the North Dakota Constitution because it is in bad faith, particularly given its prior agreement specifically to never do exactly this, and because the LMRC is not intended for public use;

IV.   Adjudge and declare that Billings County and the Billings County Commissioners' imminent plans to condemn the Short's land violates N.D.C.C. § 32-15-05 and is made in bad faith, particularly given its prior agreement specifically to never do exactly this, and because there is no demonstrated need for the LMRC;

V.   Award economic, compensatory, and punitive damages as allowed by law;

VI.   Award attorneys' fees and the costs of this action as allowed by law; and

VII.   Any other relief that the Court deems just and equitable.

34

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 37, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this second day of August 2023.

> **ROBINS KAPLAN LLP**
> By: */s/ Timothy Q. Purdon*
> Timothy Q. Purdon (ND # 05392_
> 1207 West Divide Avenue, Suite 200
> Bismarck, ND 58501
> 701-255-3000
> tpurdon@robinskaplan.com
>
> J. Austin Hurt (*pro hac vice to be filed*)
> Matthew M. Leighton (*pro hac vice to be filed*)
> 800 LaSalle Ave
> #2800
> Minneapolis, MN 55402
> 612-349-8500
> ahurt@robinskaplan.com
> mleighton@robinskaplan.com
>
> **BRAATEN LAW FIRM**
> Derrick Braaten (ND # 06394)
> 109 North 4th Street, Suite 100
> Bismarck, ND 58501
> 701-221-2911
> derrick@braatenlawfirm.com
>
> *Attorneys for Plaintiffs Sandra Short, David,*
> *Short, Donald Short, and Sarah Sarbacker*