UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| SANDRA SHORT, DAVID SHORT, DONALD SHORT, and SARAH SARBACKER, | Case No. 1:23-cv-00143-CRH |
| Plaintiffs, | |
| vs. | **DEFENDANTS BILLINGS COUNTY, LESTER IVERSON, STEVEN KLYM, AND DEAN RODNE'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |
| BILLINGS COUNTY, a political subdivision of the State of North Dakota, | |
| LESTER IVERSON, Billings County Commissioner, in his official capacity, | |
| STEVEN KLYM, Billings County Commissioner, in his official capacity, | |
| DEAN RODNE, Billings County Commissioner, in his official capacity, | |
| Defendants. | |

Defendants, Billings County, Lester Iverson, Steven Klym, and Dean Rodne (collectively "Billings County"), pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully move this Court to dismiss Plaintiffs, Sandra Short, David Short, Donald Short, and Sarah Sarbacker's (collectively "Plaintiffs") Complaint. Moreover, Plaintiffs' allegations are meritless, and are intended solely to harass and to delay condemnation proceedings before the Billings County Commission.

Billings County herein incorporates by reference the pleadings, filings, and all other documents it has submitted in this matter. See Doc. No. 29, Response in Opposition to Plaintiffs' Motion for Preliminary Injunction.

## FACTUAL BACKGROUND

Billings County does not wish to duplicate or belabor the facts underlying this dispute. A brief summary will be provided below, but for a more complete recitation of the facts, see Doc. No. 29, Response in Opposition to Plaintiffs' Motion for Preliminary Injunction; Short et al. v. Billings County, Case No. 1:20-cv-00079, Doc. No. 29, Report and Recommendations by Magistrate Judge Charles S. Miller, Jr.

Billings County, in order to provide the public and emergency responders with a safe, efficient, and reliable road system throughout the county, has been planning to construct an additional crossing over the Little Missouri River for decades. Doc. No. 1, ¶ 52. As part of its planning process, Billings County, in conjunction with the Federal Highway Administration and North Dakota Department of Transportation (the "Road Authorities"), analyzed several alternative route corridors within the county that would best meet Billings County's needs. Id. at ¶ 55. The corridor, known as "Alternative K1," ultimately selected by the Road Authorities, includes portions of the Plaintiffs' property. Id. at ¶ 61.

Construction of the Little Missouri River Crossing ("LMRC"), despite Billings County's willingness to generously negotiate with Plaintiffs, has been unnecessarily stifled by Plaintiffs' ongoing attacks, with this being the fourth lawsuit initiated by the Short family, along with one unsuccessful complaint to the Attorney General's Office.[1] Plaintiffs previously challenged the Federal Highway Administration's environmental review of the LMRC[2], as

---

[1] Short et al. v. Billings County, Case No. 1:20-cv-00079, Doc. No. 1 (D.N.D.); Short et al. v. Federal Highway Administration et al., No. 1:19-cv-00285, Doc. No. 6 (D.N.D.); Short et al. v. Billings County Board of Commissioners, No. 04-2020-cv-00015, Doc. No. 1 (N.D. District Court, Southwest Judicial District, Billings County); N.D.A.G 2020-O-09.

[2] Short et al. v. Federal Highway Administration et al., No. 1:19-cv-00285, Doc. No. 6 (D.N.D.).

well as Billings County's pre-condemnation survey activities.[3] As a result of the prolonged litigation and change in board governance, a previous board of county commissioners of Billings County entered into a settlement agreement with the Plaintiffs in August 2021 (the "Agreement"). Doc. No. 1, ¶ 98. At that point, the Board had initiated some preliminary property acquisition activities in order to negotiate the purchase of the needed property interests, such as hiring an appraiser and conducting a survey for the LMRC. Doc. No. 1-2 at 2 (resolving that the Board should cause the Alternative K1 route to be surveyed and an appraiser be hired to identify the fair market value of the necessary corridor in order to continue negotiations with affected landowners). The Shorts sued the County in an attempt to pre-empt the County from initiating eminent domain at that time. When settling the litigation, the previous Board agreed to not "pursue eminent domain to condemn any of the Short property for a Little Missouri River Crossing or pursue any legal action against the Shorts to condemn their property." Doc. No. 1-8 at 2.

After execution of the Agreement, all related property interest acquisition activities ceased, and Billings County examined alternative routes for a crossing through voluntary acquisition. Unable to locate a different preferred alternative, the LMRC Project was not pursued further until February 2023, after a new board of county commissioners had been elected. The current board determined it best to re-engage the Federal Highway Administration on Alternative K1 and reopen negotiations with the landowners prior to moving forward with any use of eminent domain. Doc. No. 1-14 at 3. In April 2023, Billings County approved offers

---

[3] <u>Short et al. v. Billings County</u>, Case No. 1:20-cv-00079, Doc. No. 1 (D.N.D.)

of $20,000.00 per acre for permanent easements and $500.00 per acre for temporary easements for the LMRC at Alternative K1. Doc. No. 1-15 at 2.

Counsel for Billings County contacted counsel for Plaintiffs to confirm representation at that time. The County followed up with an official offer letter and draft agreements on June 23, 2023. Doc. No. 1-16. Billings County, through its counsel, continued to reach out to Plaintiffs' counsel to discuss the offer, but was met with silence or delay. See Doc. No. 1-18. On August 1, 2023, counsel for Billings County again reached out to Plaintiffs' counsel to determine if Plaintiffs were interested in negotiating the easements. Again, Billings County was met with silence until August 3, 2023, when Plaintiffs formally declined the offer and provided a courtesy copy of the present Complaint.[4] On August 3, 2023, since Shorts' counsel made it clear that the negotiation process with the Short family had come to an end, Billings County passed a resolution condemning the Shorts' respective parcels through notice and deposit as authorized by Article 1, Section 16 of the Constitution of North Dakota and North Dakota Century Code § 11-10-26. See Doc. No. 1, ¶¶ 36, 131.

On August 7, 2023, Billings County effectuated its condemnation of Plaintiffs' individual parcels through the filing of the requisite notice and deposit with the Clerk of District Court for Billings County, North Dakota.

---

[4] Billings County was provided a Waiver of Service on August 11, 2023, which was executed and entered on August 21, 2023. Doc. No. 1-20.

## LAW AND ARGUMENT

**A.    Dismissal of Plaintiffs' Complaint Under Rule of Procedure 12(b)(6) is Proper.**

This suit must be dismissed under Fed.R.Civ.P. 12(b)(6) as Plaintiffs' claims lack merit and are baseless. Rule 12(b)(6) requires dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion may be granted if the complaint fails to state a claim of relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The purpose of the motion to dismiss "is to test the formal sufficiency of the statement of the claim for relief[.]" ADP, Inc. v. Barth-Peffer, Inc., No. 07-CV-055, 2008 163632, at *1 (D.N.D. Jan. 17, 2008). Although on a motion to dismiss a court is required to "take the well-pleaded allegations in the complaint as true and view the complaint, and all reasonable inferences arising therefrom, in the light most favorable to the plaintiff," St. Croix Waterway Ass'n v. Meyer, 178 F.3d 515, 519 (8th Cir. 1999), a court must dismiss a complaint under Rule 12(b)(6) when a "plaintiff can prove no set of facts that would demonstrate an entitlement to relief." Gordon v. Hansen, 168 F.3d 1109, 1113 (8th Cir. 1999). While "'specific facts' are not required, bare assertions or 'formulaic recitations' of the elements are not enough to state a claim." Roe v. Nebraska, 861 F.3d 785, 787 (8th Cir. 2017) quoting Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) and Twombly, 550 U.S. at 555, 127 S.Ct. 1955).

Further, in deciding whether to dismiss a complaint under Rule 12(b)(6), this Court is permitted to consider "materials that are part of the public record … as well as material that are 'necessarily embraced by the pleadings," such as documents attached to the pleadings. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999); see also 5C Charles

A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 3d § 1366, at 184–86 (2004) (providing that a court may consider "exhibits that are attached to the pleading, matters of which the district court can take judicial notice, and items of unquestioned authenticity that are referred to in the challenged pleading and are 'central' or 'integral' to the pleader's claim for relief").

**B.      Plaintiffs' Complaint Fails to Establish Billings County Breached a Binding Agreement Between the Parties (Count I).**

Plaintiffs' first claim against Billings County for breach of contract (Count I) fails as a matter of law. To establish a claim for breach of contract under North Dakota law, Plaintiffs must demonstrate: "(1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." Good Bird v. Twin Buttes Sch. Dist., 733 N.W.2d 601, 605 (N.D. 2007) (citations omitted). "[A] court may conclude that a contract does not exist as a matter of law where the evidence does not support a reasonable inference that the requisites for a contract have been met." Pratt v. Heartview Found., 512 N.W.2d 675, 677-78 (N.D. 1994).

To ultimately prevail on their breach of contract claim against Billings County, Plaintiffs must produce evidence that there was a legally enforceable agreement between the parties and that such agreement bound future boards of county commissioners. Whether a board of county commissioners may execute a contract extending beyond its own terms depends upon the class of power exerted by the board in creating such an agreement. Tuttle Bros. & Bruce v. City of Cedar Rapids, Iowa, 176 F. 86, 88 (8th Cir. 1910); 70 A.L.R. 794 (originally published in 1931).

Boards have two classes of power – governmental or legislative, and proprietary or business. Id.; 149 A.L.R. 336 (originally publish in 1944); Duration of contract—Binding successors, 10A McQuillin Mun. Corp. § 29:103 (3d ed.).

> A city acts in a dual capacity: (1) in a governmental or public character; and, (2) in a business or proprietary capacity. 'In its governmental or public character, the corporation is made, by the state, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state rather than for itself.' In the exercise of powers of a governmental nature, either as an agent of the state or as the local governmental organ, a city acts in the capacity of a sovereign.

State ex rel. Dreyer v. Brekke, 75 N.D. 468, 476, 28 N.W.2d 598, 602 (1947) (Christianson, C.J., concurring) (quoting Chrysler Light & Power Co. v. City of Belfield, 58 N.D. 33, 46, 47, 224 N.W. 871, 877).

When a board executes a contract through the exercise of its governmental or legislative powers, in the absence of a statutory provision, the contract cannot extend beyond the term of the board. Id.; Leidigh v. Nebraska City, 138 Neb. 136, 292 N.W. 115, 117 (1940) (holding that "[i]n the case of strictly governmental powers, the … commissioners … may make no … contract which will bind the municipality beyond the terms of their office."); Com. ex rel. Fortney, for Use of Volunteer Fire Dep't of Coal Twp., Northumberland Cnty. v. Bartol, 342 Pa. 172, 175, 20 A.2d 313, 314 (1941) (holding that "[i]n the performance of sovereign or governmental…functions…no municipal board having legislative authority, can take action which will bind its successors…It cannot enter into a contract which will extend beyond the term for which the members of the body were elected."). Alternatively, if the contract is created through the exercise of business or proprietary powers, a board may contract as any individual and bind the county beyond its term. Id. This is an important principle in our dual-party

political system.  The principle precludes one party or one interest group from forever barring an issue that is of political significance, which would carry through to future administrations, which may be led by other political parties or interest groups.  If one governing board could eliminate the use of eminent domain, property taxes, real estate taxes, special assessments, etc. relative to various parties or categories of parties in perpetuity, it would lead to chaos in government.

Here, Plaintiffs allege Billings County breached the Agreement by voting at its February 7, 2023 meeting to "proceed with the Little Missouri River crossing bridge project in the selection [sic] location within the EIS." Doc. No. 1, ¶ 135. The Agreement was executed on August 3, 2021. Id. ¶¶ 98, 103. The makeup of the board of county commissioners was altered between August 3, 2021 and February 7, 2023. Id. ¶¶ 106-107. Therefore, Plaintiffs may only succeed on their breach of contract claim if the Agreement was created by the former board of county commissioners using their business or proprietary powers such that the Agreement would bind future boards in perpetuity. Such is not the case.

Prior to the Agreement, Billings County sought to conduct regular project preconstruction activities in preparation for design, construction, and landowner property interest negotiations. The ability to conduct these pre-condemnation activities on Plaintiffs' property was authorized through the County's eminent domain authority as part of the LMRC Project. See Doc. No. 1-2. The use of eminent domain was in alignment with its authority to exercise the power to maintain public highways. Pursuant to its authority over the county road

system,[5] the board of county commissioners had the power to acquire by negotiation, condemnation or other lawful means, real and personal property and right of ways within the county for all purposes necessary to the exercise of any power granted. As detailed by the Supreme Court of North Dakota, "[t]he state has control over its highways but has delegated its power in certain instances to other official bodies, such as the board of county commissioners. These powers include the power to construct and improve highways. The grading and maintaining of public highways is a *governmental function*." Zueger v. Boehm, 164 N.W.2d 901, 906 (N.D. 1969) (emphasis added). There can be no argument that these powers held and exercised by Billings County in creating and entering the Agreement invoked its governmental powers, not business or proprietary. See Zueger, 164 N.W.2d at 906; Cass Cnty. Joint Water Res. Dist. v. 1.43 Acres of Land in Highland Twp., 2002 ND 83, ¶¶ 23-24, 643 N.W.2d 685, 694 (finding the power of eminent domain to be a hallmark of sovereignty).

As the Agreement not to initiate eminent domain at that time was entered by Billings County in the exercise of its governmental powers, the Agreement would not extend beyond the term of the board which created it. Thus, the Agreement did not forever bar Billings County from ever using eminent domain on land owned by Plaintiffs. Accordingly, a subsequent county board to that which entered the Agreement was not precluded from authorizing eminent domain activities on February 7, 2023. See Tuttle Bros., 176 F. at 88 (8th Cir. 1910); Leidigh, 292 N.W. at 117; Bartol, 342 Pa. at 175; 149 A.L.R. 336 (originally publish in 1944); 70 A.L.R. 794 (originally published in 1931); Duration of contract—Binding successors, 10A McQuillin

_____

[5] See N.D.C.C. §§ 11-10-26, 11-11-14(2), (5), (12), (14), (20), 24-01-01, and Chapter 24-05. These statutes, construed together, provide county governments with broad, supervisory authority over county road systems.

Mun. Corp. § 29:103 (3d ed.). Plaintiffs cannot demonstrate that Billings County was forever barred from using eminent domain on their land in the future due to the language of the Agreement. On February 7, 2023, as there was no contractual prohibition on this subsequent board of county commissioners, there was no duty owed and accordingly, no breach.

Furthermore, even assuming *arguendo* this Court finds the Agreement bound successive boards, it is well settled that the power of eminent domain is inalienable and cannot be contracted away or surrendered. As explained by the United States Supreme Court,

> The power of eminent domain is an attribute of sovereignty, and inheres in every independent state. The taking of private property for public use upon just compensation is so often necessary for the proper performance of *governmental functions* that the power is deemed to be essential to the life of the state. *It cannot be surrendered, and, if attempted to be contracted away, it may be resumed at will.*

State of Ga. v. City of Chattanooga, 264 U.S. 472, 480, 44 S. Ct. 369, 370, 68 L. Ed. 796 (1924) (internal citations omitted) (emphasis added); see also Cass Cnty., 643 N.W.2d at 694 (finding that states and political subdivisions cannot contract away their eminent domain powers as those powers are a hallmark of sovereignty).

The United States Supreme Court has consistently held that in the context of the Contract Clause, contracts surrendering the power of eminent domain are void. U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1, 23, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977). Elaborating on this premise, the Court held that state action to condemn particular property for public purposes, despite the government's earlier commitment not to do so, was upheld against challenges that it impaired the obligation of contract on the ground that the sovereign's surrender of its power of eminent domain could never be an enforceable obligation of contract in the first place. Wheat Ridge Urb. Renewal Auth. v. Cornerstone Grp. XXII, L.L.C., 176

P.3d 737, 743 (Colo. 2007) (citing West River Bridge Co. v. Dix, 47 U.S. 507, 533, 12 L.Ed. 535 (1848)). Thus, the Contract Clause never may demand a state's adherence to a contract that surrenders an essential attribute of its sovereignty. U.S. Trust, 431 U.S. at 23.

In Chattanooga, the State of Tennessee had previously entered into a contract with Georgia allowing Georgia to use the land at issue for railway purposes. 264 U.S. at 478, 44 S.Ct. 369. Chattanooga attempted to condemn the land governed by the contract and Georgia objected. Id. Georgia argued that its agreement with Tennessee rendered it immune from Tennessee's, and through delegation, Chattanooga's, power of eminent domain. Id. at 479, 44 S.Ct. 369. The United States Supreme Court held that Tennessee could not surrender its power of eminent domain through contract. Id. at 480, 44 S.Ct. 369. Thus, Chattanooga could pursue the condemnation. Id. at 481, 44 S.Ct. 369.

Additionally, the concept that certain core governmental powers, including eminent domain, are reserved to the sovereign and cannot be abdicated or surrendered by contract has been upheld by the Eighth Circuit and various state courts. See Chicago, B. & Q. R. Co. v. N. Kansas City Dev. Co., 134 F.2d 142, 151 (8th Cir. 1943) (holding the rule is well settled, that, since the power of condemnation is granted in the public interest, there can be no estoppel against its exercise from any private actions between the condemnor and the condemnee); Contributors to Pa. Hosp. v. City of Phila., 245 U.S. 20, 23–24, 38 S.Ct. 35, 62 L.Ed. 124 (1917) (holding that the eminent domain power cannot be surrendered by contract). Any attempt to do so is simply unenforceable. U.S. Trust, 431 U.S. at 23 ("In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."); see also Pub. Serv. Co. of Colo. v. City of Loveland, 79 Colo. 216, 228, 245 P. 493, 499 (1926) (stating that city authorities lacked "any power to execute a disclaimer upon

behalf of themselves or future city councils depriving them of the free exercise of their [eminent domain power]").

Illustrative of the Court's adherence to these principles is <u>Tennessee Gas</u>. In that case, a prior condemnation suit had been settled and the settlement memorialized in a contract. <u>Tenn. Gas Transmission Co. v. Violet Trapping Co.</u>, 200 So.2d 428, 432 (La.App.1967). In the subsequent suit, the defendants raised the contract as a defense, arguing that the settlement contract indicated that the plaintiff would not take any more of defendant's land. <u>Id</u>. at 433. The Louisiana Court of Appeals held that the plaintiff could not contract away its power to take private property for a public purpose. <u>Id</u>. Similarly, in <u>Burke</u>, the defendants pled defenses of contract, waiver, and estoppel, based on the settlement reached between the parties in an earlier suit seeking condemnation of the same property involved in the later suit. 350 P.2d at 266. The Supreme Court of Oklahoma held that the defenses of res judicata and estoppel were not available against the government in condemnation proceedings. <u>Id</u>. at 267 (explaining that holding those defenses were available "would be holding that a municipality can surrender, alienate and contract away or waive the right of eminent domain which it cannot do").

Accordingly, pursuant to the well settled rule, the current board of county commissioners was authorized to later utilize Billings County's eminent domain authority at will as the prior board did not have the power to surrender, or contract away the County's power to exercise the same. The previous board of county commissioners' decision to forego exercising its power to condemn the Short Property was an exercise of its discretion as to the use of its powers in maintaining public highways, nothing more, and future boards cannot be bound to an Agreement diminishing its full sovereign authority of eminent domain. Any attempt by Plaintiffs to extend the Agreement in a manner that would forever bar the County

from initiating eminent domain on this property is an unreasonable and unlawful extension of the language and legal authority of the County. The County could not forever bar the use of eminent domain on these properties.

Plaintiffs' argument that the Agreement does not "truly implicate [the County's] eminent domain power is without merit. The plain language of the Agreement prohibits Billings County from "pursu[ing] any legal action against the Shorts to condemn their property." Doc. No. 1-8 at 2. Plaintiffs' actions in bringing the current lawsuit also rebuts the position Plaintiffs are now taking. A new board of county commissioners utilized its eminent domain authority to condemn a portion of the Short's property and Plaintiffs brought suit alleging Billings County is estopped from doing so pursuant to the Agreement.

Further, Plaintiffs' reliance on United States v. Winstar Corp., 518 U.S. 839, 116 S. Ct. 2432, 135 L. Ed. 2d 964 (1996) is misplaced. In Winstar, the federal government, acting through the Federal Home Loan Bank Board ("Bank Board") and Federal Savings and Loan Insurance Corporation ("FSLIC") promised three thrift institutions that supervisory goodwill could be counted toward regulatory capital requirements. Winstar, 518 U.S. at 858.  Through the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Congress tightened capital requirements and federal regulators seized and liquidated the thrifts for failure to meet the new requirements. Id. "Believing that the Bank Board and FSLIC had promised them that the supervisory goodwill created in their merger transactions could be counted toward regulatory capital requirements, respondents each filed suit against the United States in the Court of Federal Claims, *seeking monetary damages* on both contractual and constitutional theories." Id. (emphasis added).

The Federal Court of Claims held the Government had breached its contractual obligations permitting the institutions to count supervisory goodwill and capital credits towards their regulatory capital requirements. Id. "In so holding, the Court of Federal Claims rejected two central defenses asserted by the Government: that the Government could not be held to a promise to refrain from exercising its regulatory authority in the future unless that promise was unmistakably clear in the contract, and that the Government's alteration of the capital reserve requirements in FIRREA was a sovereign act that could not trigger contractual liability." Id. at 859.The Federal Circuit Court affirmed the Court of Federal Claims' decision, notably holding that the unmistakability doctrine had no application in a suit for money damages. Id.

As noted by the United States Supreme Court, "nothing in the documentation or the circumstances of these [Winstar] transactions purported to bar the Government from changing the way in which it regulated the thrift industry." Id. at 868. The thrifts in Winstar did not seek "[an] injunction against application of FIRREA's new capital requirements to them and no exemption from FIRREA's terms." Id. at 871. Rather, "[t]hey simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury." Id. The United States Supreme Court, unremarkably, agreed with that position. Id.

In so holding, the Court distinguished cases such as the current dispute, where a party seeks specific performance of an agreement that "directly impede[s] the exercise of a sovereign power." Id. at 883. As clearly stated by Plaintiffs, "[t]he Shorts have already made clear that they are not interested in 'just compensation,'" and that payment of damages is allegedly

14

insufficient to remedy their concerns. See Doc. No. 30 at 7. Plaintiffs will only be satisfied if Billings County is forever barred from pursuing its sovereign act of eminent domain as to Plaintiffs' property. Defendants fail to understand how Plaintiffs' calls for the County to forever "refrain from exercising its discretionary power [of eminent domain] over discrete parcels of land," differs from surrendering its eminent domain powers as to those parcels. See Doc. No. 30 at 4.

In addition to their strained reliance on Winstar, Plaintiffs also incorrectly rely on Wheat Ridge for support. But yet again, Wheat Ridge is inapplicable to Plaintiffs' position. Wheat Ridge, in fact, upholds the "well-accepted proposition that contracts surrendering the power of eminent domain are void." Wheat Ridge, 176 P.3d at 743. The issue specific to Wheat Ridge was not the enforceability of a contract that surrendered the power of eminent domain, but rather, the enforceability of a commercial agreement that required a government agency to acquire particular private properties, by condemnation, if necessary, to sell for redevelopment. Id. In that context, the Supreme Court of Colorado determined that contracts requiring the government to exercise its eminent domain power, as distinguished from contracts impermissibly impairing the government's power to act in the future, are not void, although specific performance of the eminent domain power cannot be ordered. Id. at 743-44.

Because the Agreement is not one which simply adjusts the financial risk of subsequent legislative change, but rather strips Billings County of an essential attribute of sovereignty, the Agreement cannot be read to provide a permanent bar from initiating eminent domain on the parcel. Such a construction of the Agreement would be ultra vires and cannot be binding on the current or future boards of county commissioners. Accordingly, because Plaintiffs cannot

establish a breach of contract, this Court must dismiss their claim under Rule 12(b)(6) for failing as a matter of law.

C. **Plaintiffs' Complaint Fails to Establish Billings County Breached a Binding Agreement Between the Parties (Count II).**

Plaintiffs' claim under the doctrine of promissory estoppel fails as a matter of law because Billings County is not bound by the promises of the previous board of county commissioners. The North Dakota Supreme Court has provided that before the doctrine of promissory estoppel can be invoked, four elements must be established: "1) a promise which the promisor should reasonably expect will cause the promisee to change his position; 2) a substantial change of the promisee's position through action, or forbearance; 3) justifiable reliance on the promise; and 4) injustice which can only be avoided by enforcing the promise." University Hotel Development LLC v. Dusterhoft Oil Inc., 2006 ND 121, ¶ 11, 715 N.W.2d 153.

The same legal principles as outlined in the preceding section apply equally to formal or informal contractual agreements. Any promises the previous board of county commissioners made in regard to its use of eminent domain on the Short Property would be actions taken in the performance of sovereign or governmental functions and not binding on successive boards. Further, even if the Agreement was interpreted as binding on successive boards, that interpretation would be unenforceable as it seeks to contract away a sovereign power which the United States Supreme Court and North Dakota Supreme Court have expressly determined a political subdivision cannot do. See Contributors to Pa. Hosp., 245 U.S. at 23–24; Cass Cnty., 643 N.W.2d at 694. As such, there can be no reasonable reliance on the Agreement to forever

bar any such action on Plaintiffs' land and Plaintiffs' claim of promissory estoppel fails as a matter of law.

      **D.      Plaintiffs' Claims as to Public Use are Without Merit (Counts III and IV).**

      Plaintiffs have alleged that Billings County has violated the public use requirements of the Takings Clause and N.D.C.C. § 32-15-05. Similar claims have been unequivocally denied by the North Dakota Supreme Court. See Eberts v. Billings County Bd. Of Com'rs, 2005 ND 85, 695 N.W.2d 691, 695. Plaintiffs' public use arguments fail as a matter of law and must be dismissed by this Court.

      The Fifth Amendment to the United States Constitution and the North Dakota Constitution, Article I, Section 16, provide that the taking of private property by the government must be for a public purpose and that just compensation shall be paid to the owner. Milligan v. City of Red Oak, Iowa, 230 F.3d 355, 359 (8th Cir. 2000). "Under the Fifth Amendment, courts have employed a 'traditionally broad understanding of public purpose.'" Dahlen v. Shelter House, 598 F.3d 1007, 1012 (8th Cir. 2010) (quoting Kelo v. City of New London, 545 U.S. 469, 485, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005)). "The public use' requirement is … coterminous with the scope of a sovereign's police powers." Id. (quoting Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 240, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)). "The requirement is satisfied 'where the exercise of the eminent domain power is rationally related to a conceivable public purpose.'" Id.

      It is clear under both federal and North Dakota law, construction of roads is a public use. Kelo, 545 U.S. at 497 (2005) (O'Connor, J., dissenting) (discussing that three categories of takings generally comply with the public use requirement, with the construction of roads being "straightforward and uncontroversial"); see Eberts, 695 N.W.2d at 696. In Rindge v. Los

Angeles County, 262 U.S. 700 (1923), one of the cases cited by Justice O'Connor in her dissent mentioned above, the Board of Supervisors of Los Angeles County adopted two resolutions declaring that the public interest and necessity required the construction of two highways through the Malibu Ranch for public highway purposes. Rindge v. Los Angeles County, 262 U.S. 700, 702-3, 43 S. Ct. 689, 67 L. Ed. 1186 (1923). This determination was pursuant to a section of California state code which identifies highways among one of the public uses for which eminent domain may be exercised. Id. The Plaintiffs, owners of a large tract of land known as the Malibu Ranch, were not provided notice of the intended exercise of eminent domain. Id. One of the proposed roads would connect with a much-traveled public highway and then terminate in the boundaries of the ranch; the other is a branch off the first, where it extends to the northern boundary of the ranch and then terminates. Id.

The plaintiffs contested the County's right to condemnation in the Superior Court of the County, alleging the roads would "furnish no way of necessity or convenience for public use or travel." Id. at 704. The trial judge found all questions submitted in favor of the County and the plaintiffs appealed. Id. The District Court of Appeals affirmed and held that the taking of the property for the highways was for a public use. The plaintiffs then submitted writs of error to the United States Supreme Court to review the judgments, arguing, among other things, the use for which the property was taken was not a public use authorized by law, their property was taken without any public necessity, and the judgments of condemnation deprived them of their property in violation of the due process and equal protection clauses of the Fourteenth Amendment. Id. at 705. In its analysis, the Supreme Court held:

> the determination of [the nature of a use] is influenced by local conditions; and this court, while enforcing the Fourteenth Amendment, should keep in view the diversity of such conditions

> and regard with great respect the judgments of state courts upon
> what should be deemed public use in any state. That a taking of
> property for a highway is taking for public use has been
> universally recognized, from time immemorial. The California
> Code specifically declares 'highways' to be 'public uses' for
> which the right of eminent domain may be exercised. Here, the
> Board of Supervisors, familiar with local conditions, has declared
> these highways to be for public use; and the local and appellate
> state courts have likewise held them to be for public uses
> authorized by law.

Id. at 705-6.

The plaintiffs conceded that highways generally are a public use, but argued the contested highways at issue did not "furnish ways of convenience or necessity to the traveling public" because they extend through the Ranch alone. Id. at 706. The Supreme Court found, however, that these roads will be open to the general public to such extent as it can and may use it. Id. "It is not essential that the entire community nor even any considerable portion, should directly enjoy or participate in an improvement to constitute a public use." Id. (internal citation omitted). Ultimately, the United State Supreme Court held the taking of land for these highways was a taking for a public use authorized under the laws of California.

Additionally, again citing to the Rindge case, the Supreme Court has stated that the Court has *never* held a compensated taking to be proscribed by the Public Use Clause where the exercise of eminent domain power is rationally related to a conceivable public purpose. Midkiff, 467 U.S. 229, 241 (1984) (emphasis added). In the present case, it is clear Billings County's condemnation of Plaintiffs' property is required for the construction of the LMRC Project. Such a use is clearly rationally related to a conceivable public purpose, as it has been specifically declared as much by the North Dakota legislature and has been held by the North Dakota Supreme Court as satisfying the public use requirement. Eberts, 695 N.W.2d at 696.

Plaintiffs' bare assertion that the development of the LMRC is an illegal taking under the Public Use Clause is meritless and ignores the facts outlined in the exhibits attached to their Complaint. <u>See</u> Doc. No. 1-3 at 2 (public comments received in favor of a crossing, particularly for emergency services); Doc. No. 1-9 at 3 (public comments received in favor of a crossing); Doc. No. 1-10 at 2 (public comments received in favor of a crossing); Doc. No. 1-11 at 4 (Theodore Roosevelt Presidential Library Foundation support for the LMRC); Doc. No. 1-12 at 3 (summary of NDDOT Director comments in support of the LMRC). As explained by the North Dakota Supreme Court, "[p]roviding roadways, sewer, and water serves a basic government function. It cannot seriously be argued those uses do not provide a public advantage or public benefit." <u>City of Medora v. Golberg</u>, 1997 ND 190, ¶ 11, 569 N.W.2d 257, 260.

Nonetheless, Plaintiffs seek to challenge Billings County's use of North Dakota quick take proceedings, which were challenged by landowners in almost identical circumstances in <u>Eberts</u> where the County's right to proceed through the eminent domain statutory process was upheld by the North Dakota Supreme Court. In <u>Eberts</u>, the landowner plaintiffs challenged the quick take authority of the Defendant Billings County Board of Commissioners with similar arguments as those set forth by Plaintiffs here. <u>Eberts</u>, 2005 ND 85, ¶ 7, 695 N.W.2d 691, 693. The North Dakota Supreme Court extensively reviewed the quick take authority of Defendant Billings County Board of Commissioners for roads:

> Under N.D.C.C. § 24–01–01, the legislature has declared that "*[p]roviding adequate public highway facilities, including rural and urban links, [is] a proper public use and purpose*," and has placed a high degree of trust in the hands of those officials, including the director of the department of transportation and boards of county commissioners, "whose duty it is ... to ... develop ... highway facilities of this state, for the present as well as for future use." Section 24–05–09, N.D.C.C., authorizes a board of county commissioners

to condemn land it deems necessary for present use as a highway in the county . . .

. . .[ We conclude N.D.C.C. § 24–01–01 and N.D.C.C. §§ 24–05–09 through 24–05–15 authorize a board of county commissioners to condemn property for roads using quick take procedures.

Id. at ¶¶ 12-14 (emphasis added).

Additionally, the North Dakota Supreme Court recognized that "Section 24-01-01, N.D.C.C., places a high degree of trust in the hands of those officials, including a board of county commissioners, 'whose duty it is, within the limits of available funds, to plan, develop, operate, maintain, and protect the highway facilities of this state, for present as well as future use.'" Id. at ¶ 15.  In short, the legislature delegated the authority to the county boards of commissioners to develop roads. The legislature recognizes the public purpose associated with road building and presumes the public purpose hurdle has been met when it authorized counties to use quick take authority. No other finding on the public use and necessity is needed for a quick take proceeding under N.D.C.C. Chapters 11 or 24, as would contrarily be required if this were a standard Chapter 32 condemnation action initiated by an entity or for a purpose that lacked quick take authority. It is well settled that quick take proceedings are proper with Billings County having the authority to initiate them here, and that Plaintiffs cannot successfully challenge any public purpose for the LMRC project.

Furthermore, the North Dakota Supreme Court has stated that where a board complies with the statutory requirements, determinations on the public use and necessity have been conclusively made through the use of quick take proceedings:

In Tormaschy v. Hjelle, 210 N.W.2d 100, 103–04 (N.D.1973), we held the state had authority to use quick take procedures to condemn land for a sewage lagoon in conjunction with sanitary facilities at an interstate highway rest area. We vacated an injunction that precluded the highway commissioner from using

21

> quick take procedures, and we remanded for entry of judgment dismissing the
> landowner's action without prejudice to the landowner's right to appeal to the
> trial court for a jury trial on the issue of compensation for the land. Id. at 104.
> Our decision in Tormaschy compels a similar result in this case. We reverse the
> trial court's order granting a preliminary injunction, we vacate the injunction,
> and we remand for entry of judgment dismissing the Eberts' action without
> prejudice to their right to appeal under N.D.C.C. § 24–05–14. See Tormaschy,
> at 104.

Eberts, 2005 ND 85, ¶¶ 16-17, 695 N.W.2d 691, 697. Like in Tormaschy and Eberts, there

simply is no basis for the relief Plaintiffs seek in this matter. As discussed in Eberts, under

North Dakota law, when a county utilizes its quick take authority for a public road,

obstructionist landowners cannot prohibit the county from proceeding by arguing there is no

present use or necessity for the road. Eberts, 2005 ND 85, ¶ 15, 695 N.W.2d 691, 696.

(rejecting landowner's arguments that quick take procedures may not be used because in the

landowner's view, there was no present public use or necessity for the road and holding that a

proposed use for property as a public roadway satisfied the public use requirement).

    Even in prior proceedings related to the LMRC project in this Court, deference has been

recognized as to Billing County's determination that a public purpose is served, and necessity

has been established. Magistrate Judge Miller stated in his Report and Recommendation in the

prior federal court action initiated by the Plaintiffs against the County, "[w]ith construction of

roads being a quintessential public use, plaintiffs surely have been advised that a Fifth

Amendment public use challenge is a 'Hail Mary' effort—at best." Shorts v. Billings County,

Case 1:20-cv-00079, Doc. No. 29 at 20-21.

    The LMRC, a public road and bridge project, is rationally related to a conceivable

public purpose. It is insufficient to challenge a public use or necessity determination based on

the Plaintiffs' personal opinions and conjectures. Here, Plaintiffs cannot demonstrate Billings

County has violated the public use requirement of the Takings Clause of the United States Constitution, the North Dakota Constitution, nor N.D.C.C. § 32-15-05, and therefore, their claims alleging the same (Counts III and IV) must be dismissed.

### E. Plaintiffs Have Failed to Establish a State Law Claim with respect to Necessity and Lack of Diligence (Count V).

Under federal takings jurisprudence, "the necessity for appropriating private property for public use is not a judicial question." Rindge, 262 U.S. at 709.  As explained by the United State Supreme Court:

> The necessity for appropriating private property for public use is not a judicial question. The power resides in the Legislature, and may either be exercised by the Legislature or delegated by it to public officers. 'Where the intended use is public, the necessity and expediency of the taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the Fourteenth Amendment.' 'That the necessity and expediency of taking property for public use is a legislative and not a judicial question is not open to discussion. Neither is it any longer open to question in this court that the Legislature may confer upon a municipality the authority to determine such necessity for itself. The question is purely political, does not require a hearing, and is not the subject of judicial inquiry.'

Id. at 709 (internal citations omitted).

As to North Dakota law, the North Dakota Supreme Court grants great deference to a determination of the purported necessity for a taking of private property. See Goldberg, 1997 ND 190, ¶ 13, 569 N.W.2d 257. "The purported necessity for any taking of private property is subject to limited judicial review." City of Jamestown v. Leevers Supermarkets, Inc., 552 N.W.2d 365, 370 (N.D. 1996). "In the absence of bad faith, gross abuse of discretion, or fraud by the condemning authority, a decision the property sought is necessary for an authorized public use will not be disturbed by the courts." Id. (internal citation omitted). Here, there is no

evidence that Billings County's decision to acquire the Short Property was in bad faith, a gross abuse of discretion, or fraudulent. As discussed above, Plaintiffs' frivolous allegation that the LMRC is an illegal taking for private benefit is unsupported by the evidence and Plaintiffs' own exhibits. Further, Billings County's reference to multiple statutes in the condemning resolution, pursuant to which, when construed together, provide supervisory authority over the county road system, is insufficient to establish bad faith. Through extensive studies over many years, the federal government, in conjunction with Billings County and the North Dakota Department of Transportation, identified this particular river crossing as the least damaging practicable alternative. As such, the identification and acquisition of a portion of the Short property cannot be deemed to be in bad faith.

In 2023, Billings County decided to move forward with eminent domain proceedings to acquire the Property. Billings County reopened negotiations with the landowners prior to moving forward with any use of eminent domain. Doc. No. 1, ¶ 107; Doc. No. 1-14. In April 2023, Billings County approved offers of $20,000.00 per acre for permanent easements and $500.00 per acre for temporary easements for the LMRC at Alternative K1. Doc. No. 1, ¶ 111.

Counsel for Billings County submitted to Plaintiffs' counsel an official offer letter and draft agreements on June 23, 2023. Doc. No. 1-16. Billings County, through its counsel, continued to reach out to Plaintiffs' counsel to discuss the offer, but was met with silence or delay. See Doc. No. 1-18. On August 3, 2023, since Shorts' counsel made it clear that the negotiation process with the Short family had come to an end, Billings County passed a resolution condemning the Shorts' respective parcels through notice and deposit as authorized by Article 1, Section 16 of the Constitution of North Dakota and North Dakota Century Code § 11-10-26. See Doc. No. 1, ¶¶ 36, 131. On August 7, 2023, Billings County effectuated its

condemnation of Plaintiffs' individual parcels through the filing of the requisite notice and deposit with the Clerk of District Court for Billings County, North Dakota.

Each step of the process to acquire the Property was in compliance with governing law. See N.D.C.C. § 11-10-26; N.D. CONST. Art. 1, § 16. As this present condemnation is separate and distinct from any actions taken or foregone prior to the February 2023 decision to move forward with property negotiations and possible eminent domain proceedings, Plaintiffs cannot try to deter this Court by referencing actions taken by a previous board of county commissioners solely in the context of prior pre-condemnation proceedings resulting in a survey being conducted and an appraisal obtained, which are not at issue in the current dispute. Plaintiffs vaguely assert Billings County's condemnation of the Property is in bad faith yet provides no support for its empty contention. See Doc. No. 1, ¶ 150. Plaintiffs' allegations of bad faith fail as a matter of law as any claims of bad faith are unsupported by the evidence in this matter where Billings County has demonstrated the necessity of the Property for the LMRC and the public use and purpose to which the LMRC serves. The arguments set forth by Plaintiffs as to Billings County's alleged failure to demonstrate the taking is necessary to a public use are insufficient to overcome the discretion placed in the hands of the County regarding the same.

The additional argument set forth by Plaintiffs that Billings County has not undertaken another analysis to determine the most suitable location for the bridge solely in the eminent domain context is unsubstantiated and irrelevant. Billings County, along with the Federal Highway Administration and North Dakota Department of Transportation have performed a sufficient alternatives analysis and determined Alternative K1 to be the preferred alternative.

Billings County's search for a bridge location where landowners would voluntarily agree to sell land, although unsuccessful here, See Doc. No. 1-14 at 3, would still need to meet the federal government permitting and environmental review standards, which will only allow permitting of the "least damaging practicable alternative" that was identified through the environmental review process.

Under the National Environmental Policy Act ("NEPA"), an environmental impact statement ("EIS") ensures the consideration of the environmental impacts of proposed action and any adverse environmental effects which cannot be avoided should the proposal be implemented. Sierra Club v. Kimbell, 623 F.3d 549, 559 (8th Cir. 2010). An EIS must explore and objectively evaluate reasonable alternatives when assessing a proposed action. 40 C.F.R. § 1502.14(a). However, an analysis of alternatives need not be exhaustive. Minnesota Pub. Int. Rsch. Grp. v. Butz, 541 F.2d 1292, 1300 (8th Cir. 1976). "Thus, the EIS need contain only sufficient information to permit a reasoned choice of alternatives." Id. Requiring the evaluation of alternatives before a project is finalized, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

Importantly, the Federal Highway Administration already selected the current location as the environmentally preferred alternative for this road and bridge project. The EIS created for the LMRC assessed reasonable alternatives which were developed to meet Billings County, U.S. Forest Service, NDDOT, and American Association of State Highway and Transportation Official design standards/guidelines of the facility type, to improve the function and operational characteristics of the roadway, and to meet the purpose of, and need for, the project. As the EIS satisfied the requirements of NEPA, Billings County appropriately relied thereon

in making its decision to move forward with eminent domain proceedings for the LMRC project. It would be difficult to find another more preferable location for the bridge as a result of this detailed federal review process that has been undertaken.

With no alternative location easily identified, the current board of county commissioners is not legally prohibited due to the previous abandonment of the initiative from now taking action. There have been no substantial changes in the proposed action to be taken by Billings County for the LMRC, nor are there significant new circumstances or information relevant to environmental concerns that bear on the proposed action or its impacts such that a supplemental alternatives analysis would be necessary. Thus, Billings County has no continuing obligation to perform such additional, expensive environmental analysis, particularly since having a voluntary seller would not be a prerequisite to federal review of reasonable alternatives for a bridge.

### F.     Plaintiffs' Argument of an Open Records Request Violation is Without Basis in Fact or Law and does Not Support Any Claim for Relief Made in this Matter.

In their Complaint, Plaintiffs allege that Billings County violated its duties pursuant to an open records request made by Plaintiffs. These allegations must be dismissed with the claims made in this matter. These allegations do not provide an independent basis for relief for Plaintiffs in this matter and do not support Plaintiffs' claims for relief. Furthermore, the alleged violations of North Dakota's open records laws are state law claims, have been resolved by the North Dakota Attorney General's Office,[6] and do not provide this Court with an independent basis for federal court jurisdiction.

---

[6] N.D.A.G 2020-O-09.

Plaintiffs allege that Billings County violated their responsibilities in responding to Plaintiffs' open records request. Plaintiffs' open records request was made March 27, 2020. Billings County responded in part on April 9, 2020. Doc. No. 1, ¶ 66. However, due to the state of emergency caused by the COVID-19 pandemic, records from Billings County's agent KLJ were not available and sent until April 29, 2020. In short, Plaintiffs allege that Billings County had a duty to continue to produce documents that were created after their request was made. There is no such requirement under North Dakota law to continue to produce records created after a request was made. Furthermore, even if there was, a governing body may withhold a record that is a working paper or draft until a final draft is completed and the record is distributed. N.D.C.C. § 44-04-18(9). The documents Plaintiffs allege that Billings County failed to disclose were created after Plaintiffs' request was made, and Billings County did not violate the open records request laws. N.D.A.G. 2020-O-09. Plaintiffs' allegations of open records request violations therefore must be dismissed with all other claims in this matter.

## CONCLUSION

Based upon the foregoing, Defendants respectfully request this Court dismiss Plaintiffs' Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated this 9th day of October, 2023

**VOGEL LAW FIRM**

*/s/ TAMI L. NORGARD*
BY:  Tami L. Norgard (#05374)
     Bennett L. Johnson (#08922)
     Kylie J. Sollie (#09426)
     218 NP Avenue
     PO Box 1389
     Fargo, ND  58107-1389
     Telephone:  701.237.6983
     Email:    tnorgard@vogellaw.com
             bjohnson@vogellaw.com
             ksollie@vogellaw.com
     ATTORNEYS FOR DEFENDANTS